# APPENDIX A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SHAWN SAMSON and JACK KASHANI, | ) | CASE NO. CV 09-01433 MMM (PJWx) |
| Plaintiffs, | ) ) ) | ORDER DENYING PLAINTIFFS' MOTION TO COMPEL ARBITRATION |
| vs. | ) ) | |
| NAMA HOLDINGS, LLC, | ) ) | |
| Defendant. | ) ) ) ) | |

On March 30, 2009, plaintiffs Shawn Samson and Jack Kashani filed a motion to compel arbitration against defendant NAMA Holdings, LLC ("NAMA"). Samson and Kashani assert that they are parties to agreements with NAMA that include arbitration provisions. Samson and Kashani do not, however, assert that they are parties to the agreements in their individual capacities. Rather, they contend that they signed the agreements in their capacity "as managers" of an entity known as Alliance Network, LLC ("Alliance"). NAMA's claims against Samson and Kashani in their individual capacities are currently pending in New York state court. Samson and Kashani contend that NAMA's claims against them as individuals should be construed as claims against them in their capacity as managers and be subject to arbitration. They also seek to compel

2516

arbitration of claims against NAMA that they wish to assert in their capacity as managers.

## I. FACTUAL BACKGROUND

### A. The Alliance Network, LLC Operating Agreement

This dispute arises from the parties' involvement in Alliance, a Nevada limited liability company that was formed to develop a showroom complex for the home furnishings industry in Las Vegas.[1] On August 9, 2000, Prime Associates, LLC ("Prime") and Evan Realty Group, LLC ("Evan Realty") entered into an agreement to form Alliance.[2] Plaintiffs Samson and Kashani are the members of Prime.[3] NAMA is the successor in interest of Evan Realty.[4] Samson and Kashani signed the operating agreement on behalf of Prime. Nigel and Mousa Alliance (the "Alliance brothers"), the two members of Evan Realty, signed the agreement on behalf of that entity.[5]

Samson and Kashani each signed the operating agreement a second time below their signature on behalf of Prime. This second signature block is preceded by the printed word "MANAGER," followed by a colon.[6] The term "co-Manager" appears after Samson and Kashani's printed names.[7] Samson and Kashani afford great significance to inclusion of the terms "Manager" and "co-Manager" on the signature page.

The word "Manager" first appears in the first paragraph of the operating agreement, which

---

[1]Memorandum of Points and Authorities in Support of Petition of Plaintiffs Shawn Samson and Jack Kashani to Compel Arbitration ("Mot.") at 2-3.

[2]*Id.* at 3; Declaration of Shawn Samson in Support of Petition to Compel Arbitration ("Samson Decl."), Exh. 1.

[3]Mot. at 1.

[4]*Id.* at 1-2.

[5]Samson Decl., Exh. 1 at 56. The Alliance brothers are also the sole members of NAMA. For convenience, the court will refer to both Evan Realty and NAMA as "NAMA."

[6]*Id.*

[7]*Id.*

2

states that the contract "is executed . . . by and among [Prime] and certain other entities or individuals who are admitted to the Company as members (collectively, the 'Investor Group') . . . , and the Manager as hereinafter defined."[8] Section 4.01(a) defines "Manager." It states that "[t]he Company shall be managed by managers who shall be Jack Kashani and Shawn Samson (collectively, the 'Manager')."[9] Samson and Kashani contend that this definition, coupled with the signature block labeled "Manager" and the printed word "co-Manager" following their names demonstrates that they did not sign the operating agreement as individuals; rather, they assert, they entered into the contract solely in their separate legal capacity as "the Manager."[10]

The operating agreement contains a broad arbitration provision, which provides, in relevant part:

"SHOULD ANY DISAGREEMENT, DISPUTE, CONFLICT, CLAIM OR CONTROVERSY ARISE BETWEEN ANY OF THE MEMBERS HERETO, OR . . . BETWEEN THE COMPANY AND THE MANAGER, OR BETWEEN EVAN REALTY AND THE MANAGER WITH RESPECT TO THIS AGREEMENT OR ANY OF THE PROVISIONS THEREOF, OR AS TO THE INTERPRETATION OR EFFECT THEREOF, OR AS TO A BREACH THEREOF CLAIMED TO HAVE BEEN COMMITTED BY ANY MEMBER OR MEMBERS OR MANAGER, OR AS TO ANY OTHER MATTER, CAUSE OR THING WHATSOEVER RELATING TO THIS AGREEMENT. . . [THAT DISPUTE] SHALL BE SUBMITTED TO AND DETERMINED BY ARBITRATION IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA BEFORE AND BY THE AMERICAN ARBITRATION

---

[8]*Id.* at 12. Originally, Evan Realty was the sole member of the investor group. Other entities subsequently became members of Alliance and parties to the operating agreement.

[9]*Id.* at 32.

[10]Mot. at 1, 17-18.

3

ASSOCIATION. . . ."[11]

**B.    The Initial Dispute Between NAMA and Samson and Kashani and the Resulting Settlement Agreement**

The operating agreement grants "the Manager" authority, subject to certain conditions, to issue written "Capital Call Notices" requesting that Alliance members to contribute further funds "required for the successful conduct and operation of the purpose of the Company, as determined by the Manager."[12] In 2003, a dispute arose between Samson and Kashani, on the one hand, and NAMA, on the other, regarding a capital call issued by Samson and Kashani to finance construction of the home furnishings showroom.[13] Samson and Kashani assert that "NAMA refused to provide its share of the necessary capital,"[14] forcing them to look for new investors. Samson and Kashani sought to enter into an agreement with The Related Companies, L.P. ("Related"), pursuant to which Related was to provide guarantees and a $10 million investment in exchange for an interest in the showroom project.[15] NAMA objected to the arrangement. The parties resolved their differences, however, and the members of Alliance and Samson and Kashani entered into a settlement agreement.[16]

The first paragraph of the settlement agreement reflects that the contract was "by and among" Prime; NAMA; Crescent Nevada Associates, LLC (a new member of Alliance); "Shawn

---

[11]Samson Decl., Exh. 1 at 45-46.

[12]Exh. 1 at 15.

[13]Mot. at 5. At some time prior to this dispute, NAMA acquired Evan Realty.

[14]*Id.*

[15]*Id.*

[16]*Id.* at 5-6. The exact nature of the financial relationships created by the settlement agreement is not relevant to the issues before the court; as characterized by Samson and Kashani, however, the agreement provided, *inter alia,* "that Related [would] become[ ] a Co-Managing Member (together with an affiliate of Alliance Network) of a new Delaware limited liability company formed to own and develop the [p]roject, called World Market Center Venture, LLC ('WMCV') and [that it] would receive certain interests in WMCV." (*Id.* at 6.)

Sampson. . . an Individual;" and "Jack Kashani. . . an Individual."[17] It then states that "Samson and Kashani shall be collectively referred to herein as the 'Manager.'"[18] Samson and Kashani signed the settlement agreement three times, once on behalf of Prime; once on behalf of Alliance; and once in a separate signature block preceded by the word "Manager."[19] The settlement agreement also contains an arbitration provision:

> "ANY DISAGREEMENT, DISPUTE, CONFLICT, CLAIM OR CONTROVERSY ARISING OUT OF THIS AGREEMENT, OR ANY PROVISIONS HEREOF, OR AS TO THE INTERPRETATION OR EFFECT THEREOF, OR AS TO ANY BREACH THEREOF CLAIMED TO HAVE BEEN COMMITTED BY ANY MEMBER OR MEMBERS OR MANAGER (EACH, A 'DISPUTE'), WHETHER SUCH DISPUTE IS BETWEEN ANY OF THE MEMBERS OF THE COMPANY OR BETWEEN ONE OR MORE MEMBERS OF THE COMPANY AND THE MANAGER OR BETWEEN ONE OR MORE MEMBERS AND THE COMPANY SHALL BE DETERMINED AND RESOLVED BY BINDING ARBITRATION IN ACCORDANCE WITH ARTICLE XI OF THE ALLIANCE OPERATING AGREEMENT."[20]

**C.    Samson and Kashani's Arbitration Demand and NAMA's Counter-Demand**

The parties' differences continued after execution of the settlement agreement.[21] Various

---

[17]Sampson Decl., Exh. 2 at 66.

[18]*Id.*

[19]*Id.* at 76.

[20]Sampson Decl., Exh. 2 at 73.

[21]A detailed description of the substance of the parties' disputes is unnecessary for purposes of this motion. Neither party argues that the disputes are outside the scope of the arbitration provisions; the only issue regarding interpretation of the agreements is the capacity in which Samson and Kashani signed them. Briefly, the parties' disputes involve, among other things, the distribution of funds, the acceptance of new parties as members of Alliance, NAMA's desire to inspect the books and records, and Samson and Kashani's alleged breach of fiduciary and contractual duties. (Mot. at 9; Opp. at 3.)

disputes arose, and Alliance, two affiliates of Alliance, Samson and Kashani (collectively, the "Alliance parties") initiated arbitration before the American Arbitration Association ("AAA"), naming NAMA and the Alliance brothers as respondents.[22] The caption of the demand for arbitration listed "Shawn Sampson and Jack Kashani, in their capacity as managers of Alliance Network, LLC" as claimants, along with Alliance and its two affiliates.[23] The "Parties" section of the Alliance parties' first amended demand for arbitration, filed January 2, 2009, describes Sampson and Kashani as follows:

> "4.  Claimant/Counter-Respondent Shawn Samson is an individual. . . who, along with Jack Kashani, is the co-Manager of Alliance Network.
>
>  5.  Claimant/Counter-Respondent Jack Kashani is an individual. . . who, along with Shawn Sampson, is the co-Manager of Alliance Network."[24]

The first amended demand asserts claims against NAMA for declaratory relief; breach of contract; intentional interference with current and prospective contractual relations; actual or constructive fraud; breach of fiduciary duty; breach of the implied covenant of good faith and fair dealing; intentional interference with prospective contractual relations; and "injunction against claiming any rights obtained via section 11 of the settlement agreement and for rescission of section 11 of the settlement agreement."[25] The first amended demand does not distinguish between the relief sought by Alliance and its affiliates and the relief sought by Sampson and Kashani "in their capacity as managers." It refers simply to "Claimants."[26]

After the Alliance parties filed their demand for arbitration, the AAA transferred the matter

---

[22]Mot. at 9.  The Alliance brothers were eventually dismissed as parties to the arbitration because they were not parties to the operating agreement or settlement agreement.  (Cohen Decl., Exh. H at 11-12.)

[23]Sampson Decl., Exh. 5 at 122.

[24]*Id.*, ¶¶ 4-5.

[25]*Id.* at 164-173.

[26]*Id.*

to its International Center for Dispute Resolution, and a three-member arbitration panel was named.[27]

On November 5, 2007, NAMA filed a statement of defense and counter-demand for arbitration (the "counter-demand") naming as counter-respondents Samson, Kashani, Prime, Crescent, and Fordgate World Market Center, LLC, an entity whose status as a member of Alliance NAMA disputes.[28] NAMA's counter-demand asserted claims against Samson and Kashani, on its behalf and derivatively on behalf of Alliance and its affiliates, for breach of fiduciary duty; breach of contract; breach of the implied covenant of good faith and fair dealing; fraud and deceit; declaratory relief; accounting; unjust enrichment; and imposition of constructive trust;[29] as well as separate claims against Prime, Crescent and Fordgate World Market Center, LLC.[30]

**D.  Samson's and Kashani's Motion to Dismiss**

At some point during the arbitration, a dispute emerged as to whether NAMA's claims against Samson and Kashani were asserted against them as individuals or in their "capacity as managers" of Alliance Network.[31] Samson and Kashani drew a distinction between their actions and liability as managers and as individuals, and argued that they were only parties to the operating and settlement agreements in their capacity as managers.[32] They based this distinction

---

[27]Opposition to Plaintiff's Petition to Compel Arbitration ("Opp.") at 1; Declaration of Ronald C. Cohen in Support of Defendant's Opposition to Plaintiffs' Petition to Compel Arbitration ("Cohen Decl."), Exh. A at 6.

[28]Samson Decl., Exh. 6 at 178, 189.

[29]*Id.* at 225-43.

[30]*Id.* at 243-47.

[31]Mot. at 12.

[32]In discussing this purported separate legal capacity, Samson and Kashani's various filings in this case and in the arbitration refer, inconsistently, both to their "capacity as Manager" and "capacity as managers." The court will use the term "capacity as managers" to refer to Samson's and Kashani's claim that they are parties to the operating agreement and settlement agreement in

largely on the definition of "Manager" in the operating agreement and the use of the heading "Manager" in the signature blocks of the operating and settlement agreements.[33] NAMA, by contrast, disputed the assertion that there is a legal distinction between Samson's and Kashani's actions and liability as managers and their actions and liability as individuals. In a letter to the panel dated September 28, 2008, NAMA objected to what it characterized as Samson and Kashani's "insupportable attempt to contrive and distinguish different fictional 'capacities' in which [they] purportedly act."[34] It insisted that its claims against the pair were asserted against them as individuals.[35]

On NAMA's motion, the panel on November 5, 2008, issued an order confirming that Samson and Kashani were sued in their individual capacities.[36] The panel "conclude[d] that Mr. Samson and Mr. Kashani were each sued as individuals"; it noted, however, that its "act of declaring [this] conclusion should not be deemed to constitute a decision whether Samson or Kashani is in fact subject to individual liability for any of the claims asserted against them."[37]

Shortly after the panel issued this order, the two filed a motion to dismiss NAMA's claims against them.[38] They argued that they were not parties to the operating agreement as individuals, but rather "signed and entered into the [agreement] solely and exclusively as co-managers of Alliance Network and as co-managers of Prime Associates Group, LLC, a member of Alliance

---

a distinct legal capacity. As discussed *infra*, part II.C.1, the exact nature of this separate capacity is unclear.

[33]Cohen Decl, Exh. G at 38.

[34]Samson Decl., Exh. 11 at 275.

[35]*Id.* at 276.

[36]Cohen Decl., Exh. E at 23.

[37]*Id.*

[38]Cohen Decl., Exh. G.

8

Network."[39] They pointed to the signature blocks as evidence that they entered into the operating and settlement agreements only in their capacity as managers.[40] Additionally, they argued that the definition of the term "Manager" in the operating agreement demonstrated that there was a distinction between their capacity as individuals and their capacity as managers.[41] As noted, the agreement provided: "The Company shall be managed by managers who shall be Jack Kashani and Shawn Samson (collectively, the 'Manager')."[42] Samson and Kashani asserted that this language made it "abundantly clear that 'Manager' is a position not a person. The term 'Manager,' not unlike the terms 'CEO' or 'President' or 'CFO,' refers to an official position and capacity which happen[s] to be filled by individuals."[43] Consequently, they concluded, they "signed the agreements, not as individuals, but as representatives of the Company [i.e., Alliance]."[44]

Samson and Kashani contended that the arbitration provisions in the operating and settlement agreements confirmed their interpretation of the signature blocks and definition of "Manager" in the operating agreement. They noted that the provision in the operating agreement referred, *inter alia*, to disputes between "the Company and the Manager or between Evan Realty and the Manager," while the provision in the settlement agreement referred to disputes "between one or more members of the Company and the Manager."[45]

NAMA disagreed. It cited the provision of the settlement agreement specifying that the parties to the contract included NAMA, "Shawn Samson ('Samson'), an Individual," and "Jack

[39]*Id.* at 37 (emphasis removed).

[40]*Id.* at 37-38.

[41]*Id.* at 38.

[42]Exh. 1 at 12.

[43]Cohen Decl., Exh. G at 38.

[44]*Id.*

[45]*Id.* at 39.

9

Kashani ('Kashani'), an Individual."[46] Thus, NAMA argued, "there is no question that Samson and Kashani are each a party to and signed the [settlement agreement] in their individual capacity."[47] NAMA asserted that the agreement used the term "Manager" not to indicate a legal capacity separate from Samson's and Kashani's individual capacities, but as a term of convenience "to refer to Samson and Kashani when addressing their duties and obligations."[48] The original operating agreement, NAMA insisted, also used the term "Manager" solely as a collective term referring to Samson and Kashani as individuals.[49] Under this reading of the term "Manager," the arbitration provisions, which cover disputes involving the "Managers," encompass disputes involving Samson and Kashani in their individual capacities.[50]

On November 29, 2008, the panel issued an order dismissing Samson and Kashani as individual parties without prejudice.[51] The panel concluded that Samson and Kashani "ha[d] made a proper showing that there is at least a serious question whether they [ ] signed an arbitration agreement on behalf of themselves."[52] Based on the perceived "serious question" raised by Samson and Kashani, the panel "concluded that it ha[d] no jurisdicition over [Samson and Kashani] absent an order from a court of competent jurisdiction declaring that it does."[53] It therefore dismissed NAMA's claims against Samson and Kashani without prejudice. It noted that "[t]his dismissal is not to be deemed a determination of whether the moving parties are in fact

---

[46]Cohen Decl., Exh. H at 114.

[47]*Id.*

[48]*Id.*

[49]*Id.*

[50]*Id.* at 116. NAMA also argued that Samson and Kashani were estopped from challenging the panel's jurisdiction.

[51]Samson Decl., Exh. 12.

[52]*Id.* at 287.

[53]*Id.*

subject to arbitration, nor is it to be deemed a determination of the underlying claims against them."[54]

**E.    The Aftermath of the Motion to Dismiss and the Arbitration Hearing**

After the dismissal of NAMA's claims against Samson and Kashani as individuals, on December 8, 2008, NAMA amended its complaint in an action it had filed against Alliance's counsel in New York state court (the "New York action").[55] The amended complaint added Samson and Kashani as defendants in their individual capacities, and alleged claims against them for unjust enrichment, breach of fiduciary duty, breach of contract and conversion.[56]

A hearing on the merits of the remaining claims in the arbitration began on January 5, 2009; the proceeding was adjourned during February, but recommenced and concluded on March 19, 2009.[57] On the first day of the hearing, on NAMA's motion, the panel dismissed claims asserted by Samson and Kashani in their capacity as managers.[58] In response to Samson and Kashani's request for clarification of the reason for the dismissal, the panel stated on January 6, 2009, that the ruling was "based on the ground that the arbit[r]ability of those claims," like NAMA's claims against Samson and Kashani, "also should be decided by a court of competent jurisdiction rather than by this arbitral tribunal."[59]

Samson and Kashani continued to attend the hearing, and Samson testified over the course of twelve days.[60] On February 27, after sixteen days of testimony, Samson and Kashani filed a

---

[54]*Id.*

[55]Samson Decl., Exh 14; Opp. at 7-8. The New York action is based on allegations that Alliance's counsel represented Alliance during the parties' ongoing disputes "without disclosing secret relationships and conflicts of interest," injuring NAMA. (Opp. at 7-8.)

[56]Samson Decl., Exh. 14, at 189-96; 207-226.

[57]Opp. at 8.

[58]Samson Decl., Exh. 13 at 294.

[59]*Id.* at 295.

[60]Cohen Decl., ¶ 8.

complaint and petition to compel arbitration.[61] When the hearing resumed on March 2, 2009, counsel for Samson and Kashani expressed the view that the pendency of the petition "ha[d] no impact" on the hearing.[62] The attorney suggested that the panel proceed with the hearing and reach a determination on the merits. He noted, however, that he intended to "ask the [p]anel to style its order. . . as an interim order" in the event the petition was not resolved prior to the date the panel issued a decision; counsel stated that, "[i]n the event the California federal court does compel arbitration, we'll want to come back and schedule new dates."[63] NAMA characterized Samson and Kashani's petition as a "meritless" attempt to influence the arbitration proceeding.[64] The hearing concluded after twenty-six days of evidence on March 19, 2009. Ten percipient witnesses and three experts testified, and 1,182 exhibits were introduced.[65] The panel directed the parties to file post-trial briefs in May.[66] On March 30, 2009, eleven days after completion of the arbitration hearing, Samson and Kashani filed the present motion.

## II. DISCUSSION

### A.    Legal Standards Governing Enforcement of Arbitration Agreements

The Federal Arbitration Act ("FAA") provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA, which governs petitions to compel arbitration, provides that

"[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate

---

[61]Mot. at 10.

[62]Cohen Decl., Exh. M at 196-97.

[63]*Id.*

[64]*Id.* at 99.

[65]Cohen Decl., ¶¶ 16, 19.

[66]Cohen Decl., Exh. C at 15.

under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . ." 9 U.S.C. § 4.[67]

In enacting the FAA, Congress "declared a national policy favoring arbitration" that was intended to reverse centuries of judicial hostility to arbitration agreements. *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); see *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 n. 8 (9th Cir. 1991) ("The Federal Arbitration Act of 1925 . . . reflects the strong Congressional policy favoring arbitration by making such clauses 'valid, irrevocable, and enforceable,'" quoting 9 U.S.C. § 2). The FAA therefore calls on courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985); see also *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 22-23 (1983). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Byrd*, 470 U.S. at 218 (citing 9 U.S.C. §§ 3,4 (emphasis original)). The FAA "'is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.'" *Arreguin v. Global Equity Lending, Inc.*, No. C 07-06026 MHP, 2008 WL 4104340, *4 (N.D. Cal. Sept. 2, 2008) (quoting *Moses H. Cone Memorial Hospital*, 460 U.S. at 24).

Despite this strong policy favoring arbitration, "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to

---

[67]"If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue." 9 U.S.C. § 4.

submit.'" *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)); see also *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 9434 (1995) (explaining that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration"); *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 756 (9th Cir. 1989) ("When we are asked to compel arbitration of a dispute, our threshold inquiry is whether the parties agreed to arbitrate"); *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980) ("[T]he question whether a person is a party to (an) arbitration agreement . . . is included within the statutory issue of the making of the arbitration agreement" (citation and internal quotation marks omitted)). "While ambiguities in the language of [an] agreement should be resolved in favor of arbitration, [courts] do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House*, 534 U.S. 279, 294 (2002) (citation omitted); see also *Par-Knit Mills, Inc. v. Stockbridge Fabrics Company, Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980) ("Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocable agreement to that effect").

A district "court's role under the [FAA] is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citations omitted). In deciding these questions, federal courts must "place arbitration agreements on equal footing with other contracts." *Waffle House*, 534 U.S. at 293. Thus, "[t]o evaluate the validity of an arbitration agreement, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.'" *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (citing *First Options of Chicago*, 514 U.S. at 94). Arbitration agreements "are subject to all defenses to enforcement that apply to contracts generally." *Ingle*, 328 F.3d at 1170.

**B.**     **Samson's and Kashani's Position Regarding the Arbitration Provisions**

Because Samson and Kashani have taken a contradictory and potentially confusing array of positions regarding the arbitration provisions at issue, the court will attempt to summarize the positions before proceeding to interpret the arbitration agreement. At some point during the arbitration, Samson and Kashani asserted that they were not parties to the operating and settlement agreements in their individual capacity, but in their separate legal capacity as managers. Samson and Kashani did not define the parameters of this purported capacity during the arbitration proceeding, however, nor have they done so in this court.

Because Samson and Kashani have not clearly described the nature of their purported capacity as managers, the court has attempted to discern the nature of the capacity from their pleadings. At times, Samson and Kashani argue that they "signed the agreements, not as individuals, but as representatives of [Alliance]."[68] This argument, however, contradicts their assertion that their claims against NAMA "as managers" are distinct from Alliance's claims against NAMA, which are already in arbitration. At other times, Samson and Kashani appear to suggest that they entered into the agreements as representatives of a separate legal entity of indeterminate nature known as "the Manager." They contend, for example, that "[t]he Manager of Alliance Network is specifically identified as a party to the Alliance Operating Agreement in the first paragraph thereof," and that the agreement frequently references the actions of "the Manager" as a separate entity.[69] Overall, the "capacity as managers" that Samson and Kashani posit seems to be a hybrid individual-corporate capacity that assumes the characteristics of one or the other depending on their needs. On the one hand, Samson and Kashani suggest that they can assert claims in their "capacity as managers" of Alliance that are distinct from Alliance's claims, elevating the "individual" nature of the managerial capacity over its corporate or representative element. On the other, they contend they cannot be individually liable for breaches of fiduciary duty in their "capacity as managers," elevating its corporate aspect.

---

[68] Cohen Decl., Exh. G at 38.

[69] Mot. at 3.

When pressed for an explanation of these apparently contradictory assertions at oral argument, Samson's and Kashani's counsel could not provide a satisfactory answer. The court observed that it seemed contradictory for Samson and Kashani to argue that their alleged capacity as manager shielded them from individual liability for breach of fiduciary duty, yet at the same time permitted them to assert claims against NAMA that were separate and distinct from those being pursued by Alliance, the entity they represent. Counsel stated that there was no inconsistency because "the [claims] asserted by the manager are plainly asserted in their capacity as manager." This "explanation" is tautological, and simply assumes the capacity's existence.

In any event, the argument fails. Counsel noted that one of the claims originally asserted in arbitration by "claimants" sought a declaration that Samson and Kashani did not breach any fiduciary duties.[70] He asserted that viewing this as a claim brought by Samson and Kashani in their individual capacity would not be a "fair reading" because the pair have fiduciary duties only in their capacity as the manager of Alliance. This misapprehends the law. If Samson and Kashani breached fiduciary duties imposed on them as managers of Alliance, they would be liable in their individual capacities. See NEV.REV.STAT. 78.138 ("[A] director or officer is not individually liable to the corporation or its stockholders or creditors for any damages as a result of any act or failure to act in his capacity as a director or officer unless it is proven that: (a) His act or failure to act constituted a breach of his fiduciary duties as a director or officer; and (b) His breach of those duties involved intentional misconduct, fraud or a knowing violation of law"); *Shoe v. SAC Holding Corp.*, 137 P.3d 1171, 1184 (Nev. 2006). The parties with an interest in a declaration that Samson and Kashani did not breach their fiduciary duties, therefore, are Samson and Kashani, not a vaguely defined entity known as "the Manager."

---

[70]Although counsel noted that the claims Samson and Kashani asserted in arbitration were "first and foremost" claims for declaratory relief, only one of the eight claims in the arbitration demand seeks declaratory relief. (Samson Decl., Exh. 5 at 164-173.) The remaining claims – for breach of contract, intentional interference with current and prospective contractual relations, actual or constructive fraud, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and rescission are clearly claims that belonged to Alliance, not claims in which Samson and Kashani had an independent interest "as managers." The petition seeks to compel arbitration of all of the claims. (Petition to Compel Arbitration at 16-17.)

Furthermore, Samson and Kashani cite no authority for the proposition that they entered into the agreements in this hybrid capacity. In their reply, Samson and Kashani cite a single California decision, *Benasra v. Marciano*, 92 Cal.App.4th 987 (2001), as support for their "capacity as manager" argument.[71] At oral argument, *Bensara* was again the only case counsel cited in support of Samson's and Kashani's position. *Benasra*, however, does not assist Samson and Kashani. There, a corporation entered into two license agreements with a second corporation. *Id.* at 989. The licensor terminated the agreements and initiated arbitration against the licensee for past due royalties and trademark infringement pursuant to arbitration provisions in the license agreements. *Id.* The licensor's president then wrote a letter to the licensee's president, accusing him of "personal greed," among other things. The licensee's president sued the licensor and its president for libel. *Id.* The licensor moved to compel arbitration of the libel claim on the ground that the claim was related to the ongoing arbitration. *Id.* at 990. The licensee's president argued that he was not a party to the license agreement, and the court agreed. *Id.* The court held that the president had signed both agreements as a corporate officer, and not in his individual capacity. *Id.* It therefore declined to compel the libel claim to arbitration.

The *Bensara* court concluded that the parties to the arbitration agreement were the licensor and licensee corporations. The licensee's president argued that he *signed* the agreement in his official capacity; he did not argue, as Samson and Kashani do here, that he was a *party* to the agreement in his "capacity as president." *Bensara* discussed two capacities in which a corporate officer could sign an arbitration agreement: his capacity as an officer, i.e., on behalf of a company, and his capacity as an individual, i.e., on his own behalf. The case does not acknowledge or discuss the type of hybrid capacity Samson and Kashani posit here. Moreover, the contracts at issue in *Bensara* were fundamentally different than the agreements at issue here. Nothing in the license agreements imposed duties or obligations on the licensee's president. The only logical conclusion, therefore, was that the president had signed the agreements as a corporate

---

[71]Reply Memorandum of Points and Authorities in Support of Petition of Plaintiffs Shawn Samson and Jack Kashani to Compel Arbitration ("Reply") at 7.

17

officer, on behalf of the corporation. Here, in contrast, the operating and settlement agreements impose specific duties and obligations on Samson and Kashani. Additionally, the men could not logically have signed the operating agreement as representatives of the very entity being created by that agreement. Of the two possibilities contemplated by *Bensara*, therefore, the facts here compel the conclusion that Samson and Kashani entered into the agreements in their individual capacities, not as corporate officers. Most importantly, nothing in *Bensara* suggests the existence of the type of hybrid corporate-individual capacity urged by Samson and Kashani.

Adopting Samson's and Kashani's "capacity as manager" argument would allow them to secure an unfair advantage over their opponents. In their petition and moving papers, Samson and Kashani did not move to compel arbitration of the claims NAMA has actually asserted against them as individuals in the New York action. They contended, as they did in their earlier motion to dismiss in the arbitration proceeding, that they are not parties to the operating and settlement agreements in their capacity as individuals and thus that NAMA's claims, although alleged against them in their individual capacities, are in reality claims against them in their separate legal capacity as manager of Alliance. Essentially, they ask the court to reject NAMA's characterization of its claims, substitute what they insist is the proper characterization, and compel arbitration of the recharacterized claims.

Samson and Kashani in effect seek to use the arbitration provisions in the operating and settlement agreements as a weapon to prevent NAMA from asserting claims against them in their individual capacities, whether in court or in arbitration. Nothing in the FAA supports such an effort. A section 4 petition is a tool to assist a petitioner who seeks to arbitrate claims within the scope of an arbitration agreement; it is not a tool for avoiding litigation of claims that a petitioner insists fall outside the scope of an arbitration agreement. Cf. *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 474 (1989) ("§ 4 of the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed in the manner provided for in [the parties'] agreement,'" quoting 9 U.S.C. § 4).

If, as Samson and Kashani insist, they cannot be held individually liable on NAMA's

18

claims, and are liable only in their capacity as manager, NAMA's amended complaint in the New York action fails to state a claim against them. This is a defense that is properly raised in the New York action and decided by the New York court. It is not a reason for the court to recharacterize NAMA's claims and compel arbitration of them. If Samson and Kashani correctly interpret the arbitration provisions, they are inapplicable to claims asserted against them in their capacity as individuals. NAMA is free to assert such claims in court, without being subject to arbitration, and Samson and Kashani are free to defend on the ground that they are only liable in their separate legal capacity as manager.

Accepting Samson's and Kashani's argument that the claims must be recharacterized and compelled to arbitration would mean that NAMA could not obtain resolution in any forum of its claim that Samson and Kashani are liable to it in their individual capacities. During the arbitration, Samson and Kashani insisted, as they insist here, that claims against them in their individual capacities are not subject to arbitration. Now that NAMA has sued them individually in New York state court, they contend that those claims cannot be litigated in that forum because they are not proper individual claims and should be treated as claims against them as managers that are subject to arbitration. As can be seen, Samson and Kashani seek to prevent both the courts and the arbitrators from addressing whether they are liable to NAMA in their individual capacities. They contend that, because they are parties to the arbitration provisions in their capacity as manager, NAMA may not name them as defendants in their individual capacities in the New York action. This argument is contrary to the basic principle that every party is entitled to a "day in court" on its claims, whether that "day in court" is actually in a court or before an arbitrator.

Samson and Kashani expend considerable effort arguing that NAMA's claims "relate to" the operating agreement, and thus, under the terms of the arbitration provision, must be arbitrated.[72] This argument collapses the two-step analysis under the FAA into a single step. The first step for a court addressing a petition to compel arbitration is to determine whether an

---

[72]Mot. at 19-23.

agreement to arbitrate exists. See *Chiron Corp.*, 207 F.3d at 1130. NAMA has brought claims against Samson and Kashani as individuals. If Samson and Kashani asserted that claims against them as individuals were subject to arbitration, the court would first have to determine whether an agreement to arbitrate claims against Samson and Kashani as individuals existed.[73] Only if such an agreement were found would the court need to examine whether the claims were within the scope of the arbitration clause, i.e., whether they "related to" the operating agreement. That, however, is the posture in which Samson's and Kashani's petition and moving papers presented the dispute to the court. Samson and Kashani vigorously deny the existence of an agreement to arbitrate claims against them as individuals, yet insist that NAMA's claims against them as individuals must be arbitrated. The FAA's two-step analysis does not permit them to have it both ways.

Before oral argument, the court gave counsel a tentative order that analyzed Samson's and Kashani's capacity as manager argument in this way, and indicated that the court was not inclined to allow Samson and Kashani to subvert NAMA's fundamental right to a day in court on its claim that they are individually liable to it. Faced with the court's tentative, Samson's and Kashani's counsel argued, for the first time, that the court should compel arbitration of NAMA's claims in the New York action, *even if those claims are actually claims asserted against them in their individual capacity*. This new argument is in stark contrast to Samson's and Kashani's position – asserted consistently throughout the arbitration and in their petition, motion, and reply in this court – that they are not parties to the agreements as individuals. The court thus turns to the language of the agreements to determine the capacity in which they bind Samson and Kashani.[74]

---

[73]In fact, that is precisely what NAMA claimed during the arbitration, in opposition to Samson and Kashani's motion to dismiss.

[74]The court cannot accept Samson's and Kashani's argument in reply that "NAMA nowhere disputes that. . . [t]he Alliance Operating Agreement and the Settlement Agreement constitute valid agreements to arbitrate all disputes between NAMA and Samson and Kashani in their capacity as Manager of Alliance Network." (Reply at 1.) It is clear that the crux of the parties' dispute regarding arbitration has been, and continues to be, whether Samson and Kashani signed the agreements in their capacities as individuals or in a legally distinct capacity as managers.

## C.    Interpretation of the Agreements

"[W]hen a contract is clear, unambiguous, and complete, its terms must be given their plain meaning and the contract must be enforced as written." *Ringle v. Bruton*, 120 Nev. 82, 93 (2004); see also *State, University and Community College System v. Sutton*, 120 Nev. 972, 980 (2004) (where contractual language is unambiguous, it must be interpreted according to its plain meaning).[75] Here, the language of the operating and settlement agreements unambiguously indicates that Samson and Kashani are parties to the contracts in their individual capacities. The first paragraph of the operating agreement states that the parties to the contract are Prime, Evan Realty and "the Manager as hereinafter defined."[76] Section 4.01(a) of the contract defines "the Manager," stating: "The Company shall be managed by managers who shall be Jack Kashani and

---

NAMA vigorously disputes that the second capacity exists. (See, e.g., Samson Decl., Exh. 11 at 275 (objecting to Samson and Kashani's "insupportable attempt to contrive and distinguish different fictional 'capacities' in which [they] purportedly act"); Cohen Decl., Exh. H at 114 (arguing that "there is no question that Samson and Kashani are each a party to and signed the [settlement agreement] in their individual capacity").)

The only evidence to which Samson and Kashani point in arguing that NAMA "admitted" that they signed the agreements in their capacity as managers is a footnote in NAMA's counter-demand, which is taken out of context. The footnote states that "NAMA and purported respondents Nigel and Mousa Alliance contend that the only parties properly subject to arbitration under the relevant arbitration provisions are Alliance Network and its subsidiaries, Alliance Network's constituent members (NAMA, Prime and Crescent), persons or entities claiming to be a Member of Alliance Network (Fordgate), and Samson and Kashani in their role as 'Manager' of Alliance Network." (Samson Decl., Exh. 6 at 179 n. 1.) The footnote employs the phrase "in their role as 'Manager,'" however, only to indicate that Samson and Kashani are not named as counter-respondents in their capacity as members of Prime. This distinction was necessary because the Alliance parties had sued Nigel and Mousa Alliance in their capacity as members of NAMA. The language quoted by Samson and Kashani appears in the context of the Alliance brothers' argument that "the individual members (direct or indirect) of the constituent members of Alliance Network" were not parties to the operating agreement; this supported their pending motion to be dismissed as individual parties to the arbitration.

[75]Nevada law governs interpretation of the agreements. (Samson Decl., Exh. 1 at 46; Exh. 2 at 75.

[76]Samson Decl., Exh. 1 at 12.

Shawn Samson (collectively, the 'Manager').["77"] Under the plain language of the contract, "the Manager" is nothing more than a collective term used to refer to "Jack Kashani and Shawn Samson." The original parties to the agreement, therefore, were Prime, Evan Realty, Samson and Kashani.

Further, the settlement agreement also uses the term "the Manager" as a collective term for Samson and Kashani as individuals. This consistent usage indicates that the parties intended for the agreements to bind Samson and Kashani in their individual capacities. See RESTATEMENT 2D CONTRACTS § 202(5) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade"). The settlement agreement provides, unambiguously, that Samson and Kashani are parties to it as individuals; the first paragraph lists "Shawn Samson . . . an Individual" and "Jack Kashani . . . an Individual" among the parties to the agreement.["78"] The agreement then provides that "Samson and Kashani shall be collectively referred to herein as the 'Manager.'"["79"] Thus, as used in the settlement agreement, "the Manager" is merely a convenient shorthand meant to refer to Samson and Kashani as individuals. Because contract terms are interpreted as having the same meaning across a course of dealing, see *id.*, the settlement agreement's use of the term "the Manager" as a collective term for Samson and Kashani as individuals reinforces the court's interpretation of that term in the operating agreement. Because the arbitration provisions in both agreements apply to disputes involving "the Manager," they apply to disputes involving Samson and Kashani in their individual capacities.

In the face of this clear language, Samson's and Kashani's contention that the term "Manager" above their signatures indicates that they signed in a separate legal capacity is unavailing. The heading merely distinguishes their execution of the agreements on their own

---

["77"]*Id.* at 32.

["78"]Samson Decl., Exh. 2 at 66.

["79"]*Id.*

22

behalf, i.e., their willingness to undertake the duties, responsibilities and benefits of the position of manager, from their signatures on behalf of Prime.

To the extent Samson and Kashani argue that they signed the agreements as representatives of Alliance, this argument is unpersuasive. The operating agreement is the instrument that created Alliance; it is circular to argue that Samson and Kashani entered into the agreement as representatives of the entity being created by the agreement. Further, the arbitration provision refers to disputes between "the Company and the Manager."[80] This would have no meaning if the "the Manager" signed the agreement only on behalf of the company.[81] As respects the possibility that Samson and Kashani signed the agreements on behalf of a separate legal entity known as "the Manager," nothing in the agreements suggests an intent to create such an entity. Indeed, Samson's and Kashani's inability to specify the nature of the purported entity argues strongly against its existence. Samson and Kashani accepted positions at Alliance, as managers, with certain powers and responsibilities, and signed an agreement to that effect. Their argument to the contrary is akin to suggesting that an employee signs an employment contract not as an individual but as a representative of a separate legal entity known as "the Employee." This defies common sense, and Samson and Kashani cite no authority supporting it.

Samson's and Kashani's attempt at oral argument to inject ambiguity into the arbitration provisions was unavailing. As noted, the court finds no ambiguity in the operating agreement, and Samson's and Kashani's counsel did not cite any allegedly ambiguous language in it. Rather, counsel cited paragraph 2 of the settlement agreement, which states that "each Party, Kashani and Samson" releases "all other Parties, Kashani and Samson" from specified claims.[82] Counsel argued that the separate references to "Kashani and Samson" and to "Parties" demonstrated that

---

[80]Samson Decl., Exh. 1 at 45.

[81]As noted earlier, Samson and Kashani also contend that their claims against NAMA in their capacity as managers are separate from Alliance's claims against NAMA. If they signed the agreement only on behalf of Alliance, any claims they have that are distinct from Alliance's would not be arbitrable.

[82]Samson Decl., Exh. 2 at 67.

Samson and Kashani were parties to the agreement as individuals only for purposes of paragraph 2. The opening paragraph of the agreement, however, unequivocally states that Samson, "an Individual," and Kashani, "an Individual," collectively referred to as "the Manager," are parties to the agreement, not merely parties to a single paragraph in it.

Other paragraphs clearly bind Samson and Kashani as well, including paragraph 11(b), which recognizes that "the Manager," i.e., Samson and Kashani as individuals, have fiduciary obligations to Alliance.[83] The arbitration provision itself encompasses disputes involving the Manager. Counsel implied that these other mentions of the Manager referenced not Samson and Kashani as individuals but the men in their capacity as managers. Stated differently, he appeared to suggest that Samson and Kashani were parties to the settlement agreement in two capacities: in their individual capacity with respect to paragraph 2; and in their capacity as manager with respect to the rest of the agreement. This interpretation would have required that Samson and Kashani sign the agreement four times, however – once on behalf of Prime, once in their individual capacities, once in their capacity as manager, and, because they assert that their capacity as manager is not the same thing as their representative capacity on behalf of Alliance, once on behalf of that entity as well. Samson and Kashani signed the settlement agreement only three times. One set of signatures is preceded by the word "Prime," and is unambiguously on behalf of Prime; another is preceded by the words "Alliance Network, LLC," and is unambiguously on behalf of Alliance. The third is preceded by the word "Manager."[84] Given that the contract identifies each of Samson and Kashani individually as a party, it is clear that the third signature was in their capacity as individuals.

The court thus finds that the operating and settlement agreements bind Samson and Kashani as individuals, and that they are not parties to the agreements in a distinct legal capacity "as managers." Whatever meaning the parties intended by separately referencing "Kashani and Samson" and "Parties" in paragraph 2 of the settlement agreement, the arbitration clause is

[83]*Id.* at 72.

[84]*Id.* at 76.

contained in a separate paragraph, and binds "the Manager." That term, in both the operating and settlement agreements, consistently and unambiguously refers collectively to Samson and Kashani as individuals. Thus, to the extent that Samson and Kashani seek to recharacterize the claims in the New York action as claims against them in their capacity as manager, and compel arbitration of the recharacterized claims, the court denies their motion to compel arbitration. The court also denies the motion to the extent that Samson and Kashani seek to compel arbitration of the claims they previously asserted against NAMA in the arbitration in their capacity as manager because it concludes that there is no legal basis for this alleged capacity, and that Samson and Kashani are parties to the agreements as individuals.

The court's analysis would support compelling arbitration of claims asserted by or against Samson and Kashani in their individual capacity under the operating and settlement agreements.[85] Samson and Kashani did not move to compel arbitration of such claims in their petition or their moving papers, however. It was only at oral argument that Kashani's counsel for the first time asserted that the court should compel arbitration of claims against the two as individuals.[86] The court thus considers whether Samson and Kashani should be permitted to compel arbitration of NAMA's claims against them as individuals despite the fact that they have consistently contended they are not parties to the agreements as individuals. NAMA asserts that repudiation, waiver, and judicial estoppel bar Samson and Kashani from compelling arbitration of these claims.

**D.    Whether Samson and Kashani Repudiated the Arbitration Provisions**

In *Brown v. Dillard's Inc.*, 430 F.3d 1004 (9th Cir. 2005), the Ninth Circuit held that a

---

[85]Neither party contends that their disputes do not "relate to" the operating agreement.

[86]Counsel did not specify whether the claims Samson and Kashani sought to assert against NAMA in their capacity as manager should similarly be treated as claims by them in their individual capacities. Counsel stated that Samson and Kashani wished to compel arbitration of "all the claims we previously asserted in the arbitration." Those claims were asserted in Samson's and Kashani's capacity as manager. The court does not understand that Samson and Kashani either assert or seek arbitration of claims against NAMA in their individual capacities. To the extent they do, however, the analysis regarding NAMA's claims against them as individuals would apply equally to any claims they seek to assert as individuals.

party who repudiates an arbitration agreement by refusing to arbitrate a dispute within its scope foregoes the right to later enforce the arbitration agreement. *Id.* at 1010 ("Dillard's breach of its obligations under the arbitration agreement deprives it of the right to enforce that agreement"). The court based its holding on the principle that "[h]e who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." *Id.* at 1010 (quoting *Pry Corp. of Am. v. Leach*, 177 Cal.App.2d 632, 639 (1960) (citing *Cameron v. Burnham*, 146 Cal. 580, 584 (1905)).[87] It explained that "[t]his [was] a contract rule of general application [that was] . . . available . . . as a defense against an attempted enforcement of the arbitration agreement." *Id.*

In *Brown*, an employee demanded arbitration of her wrongful discharge claim under an agreement requiring arbitration of such claims. *Id.* at 1008. Her employer, Dillard's, refused to arbitrate on the ground that it believed her claim to be meritless. *Id.* at 1009. The employee then filed suit in state court; following removal, Dillard's moved in district court to compel arbitration. *Id.* This district court denied Dillard's' motion, and the Ninth Circuit upheld the denial on the ground that Dillard's had breached the agreement by refusing to arbitrate. *Id.* at 1010. It concluded: "If Dillard's believed Brown's claim was meritless, its proper course of action was to make that argument in arbitration. Instead, Dillard's refused to participate in the arbitration process at all. Under general principles of California contract law, Dillard's breach of its obligations under the arbitration agreement deprives it of the right to enforce that agreement." *Id.* The court observed that permitting Dillard's to compel arbitration after breaching the arbitration provision "would set up a perverse incentive scheme. Employers like Dillard's would have an incentive to refuse to arbitrate claims brought by employees in the hope that the frustrated employees would simply abandon them. This tactic would be costless to employers if they were

[87]Although the court applied California law, this principle is firmly established under Nevada law as well. See *Liu v. Watec America Corp.*, No. 2:07-CV-0863-KJD-RJJ, 2009 WL 703402, *5 (D. Nev. Mar. 16, 2009) ("[T]he party who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform," quoting *Bradley v. Nev.-Cal.-Or. Ry.*, 178 P. 906, 908-09 (Nev. 1919)).

allowed to compel arbitration whenever a frustrated but persistent employee eventually initiated litigation." *Id.* at 1012.

Here, the court has found that the arbitration provisions in the operating and settlement agreements unambiguously bind Samson and Kashani as individuals. Despite this fact, after the arbitration panel clarified that NAMA's claims were asserted against Samson and Kashani in their individual capacity, they refused to arbitrate the claims and sought to be dismissed from the arbitration. By doing so, they breached the arbitration provisions and may not seek to enforce them now. As in *Brown*, permitting Samson and Kashani to compel arbitration would create a "perverse incentive scheme" by rewarding attempts to frustrate contractual arbitration rights. See *id.* at 1012. This is because, like Dillard's, Samson and Kashani undoubtedly hoped to avoid having to defend claims asserted against them as individuals altogether by refusing to arbitrate. When NAMA persisted and refiled the claims in New York state court, Samson and Kashani moved to recast NAMA's claims as claims against them in their capacity as manager and to compel arbitration. If the court were to compel arbitration, Samson and Kashani would have lost nothing as a result of their refusal to arbitrate claims that were properly subject to arbitration; in fact, they would stand to gain a significant benefit, namely, the chance at a "do-over" of the already-completed merits hearing before the arbitration panel. At a minimum, they would likely be afforded an opportunity to reopen a closed proceeding and present new evidence. Accordingly, the court holds that Samson's and Kashani's breach of the arbitration provisions prevents them from now enforcing a right to arbitrate under the operating and settlement agreements.

Samson and Kashani contend that their conduct is distinguishable from that of the employer in *Dillard's* because they were among the parties that initiated the arbitration. Given this fact, they contend, they did not "thumb their noses" at the arbitration process the way Dillard's did. This ignores the fact that when NAMA attempted to assert claims against Samson and Kashani individually in arbitration, they refused to arbitrate those claims and successfully sought to have them dismissed. Simultaneously, they attempted to continue to assert claims *against* NAMA in arbitration, relying on the unsupportable fiction that they were parties to the arbitration agreements solely in their capacity as manager. It was only at oral argument in this action that, for the first

time, Samson and Kashani took the position claims asserted against them as individuals should be arbitrated. While Samson's and Kashani's position is perhaps more nuanced than Dillard's absolute refusal to arbitrate, the situations are identical in the following respect – both Dillard's and Samson and Kashani absolutely refused to arbitrate claims asserted *against* them. It is those claims, of course, that Samson and Kashani now seek to have the court order to arbitration.[88] If anything, the fine (and ultimately unsuccessful) distinction they seek to draw between individual liability and liability as the Manager makes their refusal to arbitrate the claims asserted against them as individuals *more* of a repudiation of the arbitration provision than it might otherwise be. Samson's and Kashani's claim that they can invoke the arbitration provision affirmatively in ways they perceive to be beneficial to them, while repudiating its application to claims that might result in the imposition of individual liability on them, is no less a repudiation of the arbitration agreements than the refusal of an employer like Dillards to arbitrate an employee's claims against it. Samson and Kashani have absolutely refused to arbitrate claims that might result in the imposition of personal liability on them. They have done so based on a legal theory that the court has found to be insupportable. The fact that they have simultaneously sought to arbitrate affirmative claims that will benefit them does not make their position regarding the defensive claims any less of a repudiation. As noted, if anything, it underscores and makes emphatic the repudiation.

Samson and Kashani argue that they did not repudiate the arbitration agreements because they reasonably believed they were parties to the arbitration clauses only in their capacity as manager. As noted, Samson and Kashani provide no legal authority for the proposition that such a capacity exists, and nothing in the agreements evinces any intent to create such a novel capacity. It is understandable that Samson and Kashani wish to interpret the arbitration provisions in a

---

[88]Samson and Kashani also seek to compel arbitration of claims they wish to assert against NAMA in their capacity as manager. In addition, as noted *infra*, Samson and Kashani also seek to have the court declare that they signed the agreements in their capacity as manager and are entitled to arbitrate claims against NAMA asserted by them in that capacity. Because there is no legal basis for Samson and Kashani's contention that they signed the agreements in their capacity as manager, the court will not compel arbitration of claims asserted in that purported capacity.

manner that permits them to assert affirmative claims in arbitration while shielding them from the arbitration of claims that might result in the imposition of liability against them. The fact that it is advantageous to them, however, does not make their position reasonable. While an erroneous interpretation of a contract, asserted in good faith, does not constitute a repudiation, see Richard A. Lord, 23 WILLISTON ON CONTRACTS § 63:48 (4th ed.), the court cannot conclude that Samson and Kashani acted in good faith in asserting that they signed the agreements in a capacity whose contours shift to suit their needs. Thus, the court concludes that Samson and Kashani repudiated the arbitration provisions.

**E.    Whether Samson and Kashani Waived the Arbitration Provisions**

The Ninth Circuit has held that a party arguing waiver of an arbitration provision "bears a heavy burden of proof," since waiver "is not favored" and "[a]ny examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements." *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986). A party seeking to prove waiver of the right to arbitrate must show: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration from such inconsistent acts." *Id.*

Here, the first two elements are easily satisfied. Samson and Kashani were aware of the arbitration provisions in the agreements . Despite their contention that the provisions bound them only in their capacity as manager, the court has found that the provisions unambiguously apply to them as individuals. Thus, they should have been aware of the right to arbitrate claims asserted against them in their individual capacity. Their refusal to arbitrate NAMA's claims was clearly inconsistent with this right.

NAMA was also significantly prejudiced by Samson's and Kashani's actions. The two men participated in the arbitration for twenty months and did not seek dismissal of NAMA's claims against them until two months before a hearing on the merits.[89] This forced NAMA, at significant cost, to revise its arbitration strategy substantially and to refile its claims against Samson and

---

[89]Opp. at 5.

29

Kashani in New York state court.[90] Samson and Kashani compounded this prejudice by waiting to compel arbitration until completion of the merits hearing before the arbitration panel, a hearing in which they participated and which they observed.

Samson and Kashani contend that they did not waive the arbitration provisions because they initiated arbitration and did not seek to litigate any claims against NAMA in court. What matters, however, is that they consistently refused to arbitrate claims against them in their individual capacity, while simultaneously insisting that they had the right to assert affirmative claims against NAMA in the arbitration. This compels the conclusion that Samson and Kashani acted in bad faith in an attempt to frustrate NAMA's right to arbitrate claims against them as individuals. As a consequence, they waived the right to arbitrate claims against them in their individual capacity and cannot now enforce such a right. *St. Agnes Medical Center v. PacifiCare of California*, 31 Cal 4th 1187, 1195 (2003) ("Both state and federal law emphasize that no single test delineates the nature of the conduct that will constitute a waiver of arbitration. . . . The decisions likewise hold that the 'bad faith' or 'wilful misconduct' of a party may constitute a waiver and thus justify a refusal to compel arbitration").[91]

---

[90]Cohen Decl., ¶ 20.

[91]Samson and Kashani attempt to analogize this case to *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114 (9th Cir. 2008), and *St. Agnes Medical Center*, 31 Cal 4th 1187, two cases in which courts held that arbitration provisions were not waived. The effort fails, as neither case involved bad faith by the party seeking to enforce the arbitration provision. In *Cox*, the court held that a party who responded to an informal arbitration demand by asserting that the dispute was not ripe for arbitration did not waive its right to seek arbitration at a subsequent time. See *Cox*, 533 F.3d at 1125. Nothing in the opinion suggests that the employer's belief that the dispute was not ripe was unreasonable or the product of bad faith. In *St. Agnes Medical Center*, the court held that a party who files a lawsuit seeking a declaration that a contract is terminated due to a condition subsequent does not waive the right to enforce an arbitration provision in that contract. See *St. Agnes Medical Center*, 31 Cal.4th at 1199-1200. The court noted that, in seeking to void the contract based on a condition subsequent, the party did not claim that a mutual agreement to arbitrate never existed. *Id.* That is exactly what Samson and Kashani have done with respect to claims against them in their individual capacity, however. Moreover, as in *Cox*, *St. Agnes Medical Center* did not involve evidence that the party seeking to enforce the arbitration provision adopted its earlier position in bad faith.

**F.    Whether the Court Should Apply Judicial Estoppel**

Judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations omitted). "[F]ederal law governs the application of judicial estoppel in federal court." *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 603 (9th Cir. 1996). The doctrine applies to positions taken in the same action or in different actions. See *id.* at 605 ("We now make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation"). It also "applies to a party's stated position whether it is an expression of intention, a statement of fact, or a legal assertion." *Wagner v. Professional Engineers in California Government*, 354 F.3d 1036, 1044 (9th Cir. 2004) (citing *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997)).

Factors relevant in deciding whether to apply the doctrine include: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has successfully advanced the earlier position, such that judicial acceptance of an inconsistent position in the later proceeding would create a perception that either the first or the second court had been misled; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751 (citations omitted).

In addition to these factors, the Ninth Circuit examines "whether the party to be estopped acted inadvertently or with any degree of intent." *EaglePicher Inc. v. Federal Ins. Co.*, CV 04-870 PHX MHM, 2007 WL 2265659, *3 (D. Ariz. Aug. 6, 2007) (citing *Johnson v. Oregon Dep't of Human Resources Rehab. Div.*, 141 F.3d 1361, 1369 (9th Cir. 1998)). "Judicial estoppel applies when a party's position is 'tantamount to a knowing misrepresentation to or even fraud on the court.'" *Johnson*, 141 F.3d at 1369 (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362-63 (3d Cir. 1996)). "If incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply." *Id.* (citing *In re Corey*, 892 F.2d 829, 836 (9th Cir. 1989)); see also *Wyler Summit Partnership v. Turner Broadcasting Sys., Inc.*, 235 F.3d 1184, 1190 (9th Cir. 2000) ("The doctrine of judicial estoppel

31

requires, *inter alia*, a knowing antecedent misrepresentation by the person or party alleged to be estopped and prevents the party from tendering a contradictory assertion to a court," citing *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)). It is when "a claimant's particular representations are so inconsistent that they amount to an affront to the court[ that] judicial estoppel may apply." *Johnson*, 141 F.3d at 1369.

In this case, there was no basis to apply judicial estoppel until Samson and Kashani asserted at oral argument that claims against them in their individual capacity should be arbitrated. Until that time, Samson and Kashani had consistently argued that their capacity as manager was distinct from their capacity as individuals, and that they were parties to the arbitration provisions only in their capacity as manager. The position Samson and Kashani expressed at the close of oral argument, however, is clearly inconsistent with this earlier position. To the extent that Samson and Kashani now seek to compel arbitration of claims asserted by or against them as individuals, therefore, the first element of the test for judicial estoppel is met.[92]

Samson and Kashani also successfully advanced their earlier position. They persuaded the arbitrators that there were "serious questions" as to whether they signed the arbitration agreement in their capacity as manager. As a result, they achieved the end they desired – they caused the arbitrators to dismiss claims asserted against them as individuals and to treat those claims differently than the balance of the claims in arbitration mid-stream. The fact that the dismissal was without prejudice does not alter this fact. Samson and Kashani convinced the panel that their assertion of a separate legal capacity as manager was meritorious.

Turning to the third factor, there is no doubt that permitting Samson and Kashani to switch positions at this point would unfairly benefit them. By insisting that they were not parties to the arbitration agreements as individuals, Samson and Kashani were able to remove claims asserted against them from the arbitration. The arbitration is now complete, and compelling arbitration of those claims at this point would, at a minimum, give Samson and Kashani the opportunity to

---

[92]As noted, Samson and Kashani's petition and motion only addressed claims asserted in their capacity as manager. At oral argument, they did not state that they sought to assert claims against NAMA as individuals.

32

reopen the arbitration and present additional evidence. This is significant, since the claims NAMA asserted against them are inextricably intertwined with the claims asserted by Alliance that have already been arbitrated.

Finally, the court has concluded that Samson and Kashani acted with bad faith intent to frustrate NAMA's right to arbitrate its claims against them, and in fact attempted to prevent resolution of those claims in any forum. This causes the court to conclude that their adoption of an inconsistent position now smack more of "chicanery," *Johnson*, 141 F.3d at 1369, than of an innocent mistake. Thus, all factors weigh in favor of invoking judicial estoppel at this point in the case. Consequently, the court concludes that Samson and Kashani are estopped from now asserting that claims against them in their individual capacity should be arbitrated.[93]

---

[93]The court notes that Samson and Kashani did not simply file a petition to compel arbitration but a joint "petition to compel arbitration and complaint for declaratory and injunctive relief." Because the court's ruling on the petition to compel arbitration resolves all the issues raised in the declaratory relief claim, the court dismisses that claim. See *In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2d Cir. 1993) ("Where a district court has before it a declaratory judgment action and a direct action containing all of the issues in the declaratory judgment action, and decides the common issues in the direct action, it may exercise its discretion to dismiss the declaratory judgment complaint," citing *Tyler Pharmacal Distribs., Inc. v. U.S. Dep't of Health, Educ., and Welfare*, 408 F.2d 95, 97 (7th Cir. 1969)). Samson and Kashani also seek injunctive relief under the All Writs Act, 28 U.S.C. § 1651. They assert that enjoining NAMA from pursuing its claims in the New York action would be "in aid of [the court's] jurisdiction." "The All Writs Act authorizes federal courts to issue all writs necessary and appropriate in aid of jurisdiction and agreeable to usages and principles of law. The writs are extraordinary writs and as such should be reserved for really extraordinary causes." 21A FED. PROC., L. ED. § 51:208 (footnotes omitted). The Act "is entirely permissive; the writs may be granted or withheld in the sound discretion of the court." *Id.* The court does not consider this case extraordinary, nor can it discern how the relief Samson and Kashani seek would aid the court's jurisdiction. In fact, based on the court's analysis above, Samson and Kashani are not entitled to injunctive relief prohibiting NAMA from pursuing the New York action. The court therefore declines to issue an injunction under the All Writs Act.

33

### III. CONCLUSION

For the foregoing reasons, the court denies Samson and Kashani's motion to compel arbitration.

DATED: May 20, 2009

*Margaret M. Morrow*
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE