Filed 8/7/13  NAMA Holdings v. Dorsey & Whitney CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| NAMA HOLDINGS, LLC, | B238449 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BS133153) |
| DORSEY & WHITNEY LLP, | |
| Defendant and Respondent; | |
| RONALD P. SLATES, P.C., et al., | |
| Objectors and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed in part, reversed in part.

Horvitz & Levy, Jeremy B. Rosen, and John F. Querio for Plaintiff and Appellant and Objectors and Appellants.

Greines, Martin, Stein & Richland, Robert A. Olson; Dorsey & Whitney, Kent J. Schmidt, and Jill Hammerbeck for Defendant and Respondent.

# INTRODUCTION

Plaintiff and appellant NAMA Holdings, LLC (NAMA) sought permission, pursuant to Civil Code section 1714.10 (section 1714.10), to file a complaint against defendant law firm, Dorsey & Whitney LLP (Dorsey), for accepting funds from a client against whom NAMA had a substantial judgment. NAMA alleged Dorsey was guilty of fraudulent transfer of funds and conversion. Dorsey filed opposition and also filed a special motion to strike pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16 (section 425.16). The trial court refused permission to file the complaint under section 1714.10, granted the anti-SLAPP motion, and sanctioned NAMA and/or its counsel (appellants Ronald P. Slates, P.C., Ronald P. Slates, J. Steven Bingman, and Johnny Kim) under Code of Civil Procedure section 128.7.

NAMA and its counsel appeal from the trial court's orders. Because we conclude that NAMA's complaint related to protected activity and NAMA failed to demonstrate a likelihood of prevailing on the merits, we affirm the order granting the anti-SLAPP motion and striking the complaint. That order being dispositive, we do not find it necessary to consider the order pursuant to section 1714.10. We reverse the order imposing sanctions, concluding that counsel for NAMA did not engage in egregious conduct justifying sanctions.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. Inception of the Project

The World Market Center (the project) is a real estate development in Las Vegas, conceived by Shawn Samson and Jack Kashani. As originally planned, the project was to consist of eight buildings and was to be constructed in eight phases. NAMA, the investment entity of Nigel and Mousa Alliance, became an investor in the project. An operating agreement dated July 20, 2000, created Alliance Network, which was comprised of three members: NAMA, Prime Associates Group, LLC (Prime) (an entity

owned by Samson and Kashani), and Crescent Nevada Associates, LLC (Crescent). Seventy percent of the capital contributions were to come from NAMA, 20 percent from Crescent, and 10 percent from Prime. Samson and Kashani were to provide "sweat equity" and serve together as Alliance Network's managers. Samson's and Kashani's powers and responsibilities were detailed in the operating agreement. Phases 1 and 2 were completed in July 2005 and January 2007, respectively.

## II. The Settlement Agreement and the Creation of World Market Center Venture

As the project progressed, disputes arose among the members of Alliance Network, which were temporarily resolved pursuant to a settlement agreement executed in April 2004 by the members of Alliance Network (NAMA, Crescent, and Prime), and Samson and Kashani. The settlement agreement provided a mutual release of any prior claims among members of Alliance Network and the managers. It also created Alliance Network Holdings, LLC (Alliance Holdings), a wholly-owned subsidiary of Alliance Network, and Network World Market Center, LLC (Network), a wholly-owned subsidiary of Alliance Holdings (collectively, the Alliance Companies). The settlement agreement also admitted Related World Market Center, LLC (Related) into the project, with Related agreeing to become a 50 percent equity participant in the project. Related's participation in the project was memorialized in the WMCV operating agreement, which formed and governed World Market Center Venture, LLC (WMCV). The members of the WMCV operating agreement were affiliated with Related and Network.

## III. Phase 3 of the Project

In October 2006, WMCV tendered to Alliance Network's managers a proposed funding notice for phase 3 of the project. The managers forwarded the notice to the members of Alliance Network (Prime, Crescent, and NAMA), and each member was required to approve or disapprove of the notice. Alliance Network's affiliate, Network,

was required to inform WMCV whether it would contribute its proportionate share of the phase 3 funding.

NAMA and the other members of Alliance Network unconditionally elected to invest in phase 3. However, when the time came for funding to be made, NAMA placed numerous conditions on its tender. Accordingly, Samson and Kashani refused the tender from NAMA.

Fordgate World Market Center, LLC (Fordgate), purchased NAMA's interest in phase 3. In December 2006, Crescent assigned its interest in phase 3 and subsequent phases to Fordgate. NAMA disputed the purchase of its interest by Fordgate and Crescent's assignment of its interest to Fordgate because NAMA was not allowed to exercise its right of first refusal.

## IV.    The Demand to Arbitrate

The Alliance Companies (Alliance Network, Alliance Holdings, and Network), and Samson and Kashani (sometimes collectively referred to hereafter as the claimants), filed a demand to arbitrate. The claimants stated that because of NAMA's failure to contribute its share of capital as promised in connection with phase 3, they suffered millions of dollars in damages. They further alleged that NAMA had no further right, title, or interest in Alliance Network or its affiliates or in any phase of the project "other than having only a Distribution Interest and Percentage Interest in Phase 1 and Early Stage Ancillary Businesses." They sought a declaration to that effect, and another that the claimants did not breach any duties or contractual obligations and acted appropriately under the operating agreements.

In November 2007, NAMA denied the claimants' allegations and asserted claims for itself and derivatively on behalf of Alliance Network. It named Samson, Kashani, Prime, Crescent, and Fordgate as counter-respondents. NAMA alleged that Samson and Kashani and the other counter-respondents had misappropriated income and assets properly belonging to Alliance Network, had wrongfully purported to transfer NAMA's interests in Alliance Network, and had withheld and diverted payments and distributions

4

due to NAMA.  As a result, Alliance Network and NAMA were deprived of their rightful interests.  NAMA specifically alleged that Samson and Kashani improperly refused to distribute $19 million of funds held by Alliance Network, and instead used the money to fund their litigation against NAMA.

The arbitrators dismissed Samson and Kashani, as individuals, from the matter in November 2008 without deciding whether the two individuals were in fact subject to arbitration and without determining on the merits the underlying claims against them. The entity they controlled, Prime, remained a party to the arbitration.  In January 2009, NAMA filed an amended statement of defense and counter-demand for arbitration that contained causes of action for declaratory relief and for an accounting.  NAMA sought a declaration that, among other things, pursuant to the parties' agreements, the net proceeds of capital transactions were to be considered part of cash available for distribution and all such proceeds had to be distributed quarterly to the members of Alliance Network.

## V.      The Arbitration Hearing and the Arbitration Panel's Final Award

The arbitration hearing took place from January through March of 2009. Ultimately, the arbitration panel concluded that when the proposed funding notice was delivered to Alliance Network and NAMA for construction of phase 3 in October 2006, Samson and Kashani "failed to conduct any sort of meaningful or adequate review of Related's Funding Notice to determine whether it was in the best interests, or 'inimical' to the best interests, of Alliance Network or its affiliates. . . .  In general, the evidence established that, subsequent to the formation of WMCV, Samson and Kashani largely abdicated their contractual duties to act on behalf of Alliance Network, and instead shifted their allegiance to protecting Prime's interests and deferring to the wishes of Related.  [¶]  In addition, as of the time NAMA was called upon to determine its response to the Funding Notice, Samson and Kashani had failed to provide NAMA with information respecting the Project required under the relevant agreements and necessary to NAMA's ability to rationally evaluate its options for responding to the Funding Notice."  The panel found that Samson and Kashani breached their contractual

5

obligations by failing to review the funding notice and instead approving it even though it contained terms that were inimical to the interests of Alliance Network and NAMA. The inimical terms included a provision that retained as reserves $18 million that would otherwise have been available for distribution. The panel noted that the parties' dispute included "an $18,214,865.95 distribution paid to Alliance Network in June 2005 arising out of the refinancing of the Phase 1 construction loan. . . . Samson and Kashani refused to make the distribution, . . . on the theory that these funds could be used to fund Claimants' litigation activities against NAMA." The panel concluded that every explanation offered by Samson and Kashani of their decision to reserve the distribution violated NAMA's rights.

The panel also found that a provision approved by Samson and Kashani to include a $7 million salary distribution for themselves was inimical to Alliance Network's interests. The panel said: "It understates matters to say that the Managers wronged NAMA in this instance by approving a Funding Notice containing this investor-funded salary distribution. That approval was just the final act needed to bring to fruition their own wrongful plan, begun much earlier, to take from the investors a salary distribution for themselves to which they were not then contractually entitled. The evidence established that this plan was the work of the Managers."

The panel concluded that NAMA would have been within its rights to reject the notice or accept it conditionally on the ground that performance on its part was excused by the managers' antecedent breaches. However, NAMA unconditionally accepted the funding notice and then imposed substantial conditions when called upon to tender its contribution for phase 3, with the result that the tender was rendered ineffective and constituted a default. As a result of that default, NAMA lost any rights associated with phase 3. However, the panel concluded that NAMA continued to own its former interests in phases 1 and 2 and, contrary to the claimants' arguments, remained a member of Alliance Network with full rights to participate in future phases after phase 3.

As "other relief," the panel ordered as follows: "Claimant Alliance Network shall pay to NAMA, within thirty days of the date of this Final Award, $12,750,405.00

6

(*representing NAMA's 70% share of the $18,214,865.95 of proceeds distributed to Alliance Network in June, 2006*) together with interest at the rate of 5% from the date Alliance Network received these monies until the date of payment." (Italics added.)

NAMA was also granted monetary relief against claimants Alliance Network, Alliance Holdings, and Network as sanctions for discovery misconduct. Those claimants were ordered to reimburse NAMA for the administrative fees and expenses paid to the American Arbitration Association and the arbitrators in the amount of $414,211.68.

**VI.    The Claimants' Petitions to Correct/Vacate the Award, NAMA's Petition to Confirm the Award, and the Appeal**

Claimants filed petitions to correct or vacate the arbitration award. NAMA filed opposition and also filed a petition to confirm the arbitration award.

The court denied the claimants' petitions to correct or vacate the arbitration award, granted NAMA's petition to confirm the arbitration award, and entered judgment in its favor, concluding that the arbitration panel did not exceed its powers. NAMA then filed a motion for attorney fees and costs which the court granted, awarding NAMA $591,818.18.

The claimants filed notices of appeal from the judgment and order confirming the award and denying the petition to vacate or correct the award, and from the postjudgment order awarding attorney fees and costs.

We affirmed the trial court's judgment in a nonpublished opinion filed on June 19, 2012, *Prime Associates Group, LLC v. NAMA Holdings, LLC*. (B226167).

## VII. NAMA's Efforts to Collect on the Judgment

NAMA attempted to collect the damages awarded by the arbitration panel, but by April 2011 it had succeeded in recovering only $1,885,882.76 from Alliance Network.[1] NAMA was still owed $12,778,149.

## VIII. The Present Action

Dorsey represented Samson, Kashani, and Prime in the underlying arbitration (which commenced with the demand to arbitrate in 2007) and other related proceedings.[2] Dorsey received its fees out of funds Alliance Network deposited in a client trust account established by Samson and Kashani. From March 2008 through October 2009, Samson and Kashani directed Alliance Network to transfer approximately $6.5 million from Alliance Network's bank account to an account entitled "Alliance Network LLC Benef Client Lawyer Trust Account Dorsey & Whitney LLP Trustee." Some of the transfers were in payment of previous Dorsey invoices, while other transfers were designated as replenishment of Dorsey's retainer. In June 2009 alone, Samson and Kashani caused

---

[1]    This court also decided a related case involving NAMA's collection efforts in a nonpublished case filed on June 19, 2012, *Network World Market Center, LLC v. NAMA Holdings, LLC* (B233397).

[2]    Shortly before the arbitration hearing was to begin, Samson and Kashani moved to be dismissed from the arbitration, claiming the panel did not have jurisdiction over them as individuals. The panel granted the motion over NAMA's objection and dismissed Samson and Kashani from the arbitration with prejudice; Prime, the entity they controlled, remained a party to the arbitration. NAMA added Samson and Kashani as defendants in a case already pending in New York against other parties who were not subject to arbitration. Dorsey also represented Samson, Kashani, and Prime in the New York action. Samson and Kashani filed a petition and complaint in the United States District Court for the Central District of California, seeking to enjoin the New York action and to compel their participation in the arbitration. They waited until after the arbitration hearing had concluded before moving on that petition. (See *Samson v. NAMA Holdings, LLC* (9th Cir. 2011) 637 F.3d 915.) The district court denied their petition and dismissed their complaint, specifically finding their conduct to be in bad faith, labeling it as "chicanery." The Ninth Circuit affirmed, finding that NAMA was significantly prejudiced by Samson's and Kashani's actions. (*Id*. at p. 934.)

8

Alliance Network to pay into the trust account maintained by Dorsey $3 million to replenish Samson and Kashani's retainer for future work in representing Samson, Kashani, and Prime in the litigation against NAMA. Shortly thereafter, on July 28, 2009, the arbitrators entered their award. At that time, $3 million remained in the Alliance Network trust account maintained by Dorsey. Dorsey continued to periodically withdraw funds from the trust account for fees incurred from December 2009 through September 2010.

On August 3, 2011, NAMA filed a petition pursuant to section 1714.10 seeking the trial court's permission to file a complaint against Dorsey in order to recover some of the funds still owed by Alliance Network. The proposed complaint contained causes of action for fraudulent transfer (Civ. Code, §§ 3439.04 & 3439.05), common law fraudulent transfer, conversion, intentional interference with contract, and unjust enrichment. Specifically, NAMA alleged that Dorsey participated in a scheme to defraud and conceal funds from NAMA by creating a trust account for Alliance Network where Samson and Kashani could hide assets from NAMA. NAMA alleged that the transfers made by Alliance Network to Dorsey were made with Samson's, Kashani's, and Dorsey's actual intent to hinder, delay and/or defraud NAMA.

A status conference was held on August 24, 2011, at which the trial court stated it had reviewed the matter and tentatively considered the petition as falling under one of the exceptions found in section 1714.10.

Dorsey filed opposition to the section 1714.10 petition, an anti-SLAPP motion (§ 425.16), and a motion for sanctions (Code Civ. Proc., § 128.7).

Ultimately the trial court denied NAMA permission to file the complaint, concluding that it did not fall under either of the exceptions in section 1714.10, subdivision (c). It also granted Dorsey's anti-SLAPP motion, finding all of NAMA's claims arose out of petitioning activity by Dorsey and NAMA had failed to establish a probability of prevailing on any of its claims, and dismissed the complaint on that basis. Finally, the court granted Dorsey's motion for sanctions, finding that NAMA's claims were not warranted by existing law and its factual assertions were not supported by the

9

evidence, and ordered NAMA's counsel to pay sanctions to the court of $5,000. NAMA's counsel paid the sanctions and also responded to the trial court's order to show cause, asserting that counsel did not misrepresent the facts in the record or advance frivolous claims that were not warranted by existing law.

This timely appeal followed.

## DISCUSSION

### I.      Standards of Review

An order granting or denying an anti-SLAPP motion is reviewed de novo. (*Cole v. Patricia A. Meyer & Associates*, *APC* (2012) 206 Cal.App.4th 1095, 1105.) An order granting or denying a petition to file a complaint under section 1714.10 is also reviewed de novo. (*Berg & Berg Enterprises*, *LLC v. Sherwood Partners*, *Inc.* (2005) 131 Cal.App.4th 802, 822.) An order imposing sanctions under Code of Civil Procedure section 128.7 is reviewed for abuse of discretion. (*Guillemin v. Stein* (2002) 104 Cal.App.4th 156, 167.)

### II.      Anti-SLAPP Motion

The anti-SLAPP statute allows a court to promptly dismiss unmeritorious actions or claims that are brought to chill another's valid exercise of his or her constitutional rights of freedom of speech and petition for the redress of grievances. (§ 425.16, subd. (a); see *Mann v. Quality Old Time Service*, *Inc.* (2004) 120 Cal.App.4th 90, 102 (*Mann*).) The statute requires a two-step analysis. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.) As stated in the language of the anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free

10

speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The Legislature has mandated that the provisions of section 425.16 be broadly construed. (§ 425.16, subd. (a); *Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728, 735.)

        *A.     Protected Activity*

     As relevant here, subdivision (e) of section 425.16 provides that, "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: . . . (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."

     "As our Supreme Court has stressed, 'the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]' (*City of Cotati v. Cashman*[, *supra*,] 29 Cal.4th [at p.] 78.) 'In other words, "the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]"' (*Peregrine Funding*, *Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 670.)" (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 267 (*Tuszynska*).) "'If the mention of protected activity is "only incidental to a cause of action based essentially on nonprotected activity," then the anti-SLAPP statute does not apply.'" (*Aguilar v. Goldstein* (2012) 207 Cal.App.4th 1152, 1160 (*Aguilar*).)

     NAMA argued below that subdivision (e)(1) through (e)(3) cannot apply because its complaint does not seek to impose liability on Dorsey for any statement or writing; it seeks to hold Dorsey liable for the act of retaining funds. The trial court concluded, however, that section 425.16 applied because, quoting from *Flores v. Emerich & Fike* (E.D. Cal. 2006) 416 F.Supp.2d 885, 908, "'[t]he alleged acts [in NAMA's complaint]

11

are all related to the . . . defendants' right to petition the courts to represent clients as attorneys.'" NAMA argues this is not the correct test. It argues that the plaintiff's claims must be *based on* the defendant's protected activity as defined by subdivision (e), not simply related to that activity in some general sense. (Citing *Aguilar*, *supra*, 207 Cal.App.4th at p. 1160.) It asserts that the trial court failed to distinguish between speech or petitioning activity that is mere evidence related to liability, on the one hand, and liability that is based on speech or petitioning activity, on the other. (*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1214-1215.) "Not all attorney conduct in connection with litigation, or in the course of representing clients, is protected by section 425.16." (*California Back Specialists Medical Group v. Rand* (2008) 160 Cal.App.4th 1032, 1037.)

NAMA argues that its claims are not based on Dorsey's representation of Samson, Kashani, and Prime or any other aspects of its litigation activity in the arbitration, post-arbitration court proceedings, or the New York litigation. Instead, its claims are based on Dorsey's acceptance and conversion of funds fraudulently transferred by Alliance Network without the latter receiving reasonably equivalent value in return. NAMA argues that Dorsey's litigation activity itself is not a necessary element of NAMA's claims.

We agree with the trial court's conclusion that although the complaint was based on a challenge to retaining funds, the anti-SLAPP statute nonetheless applies. Samson's and Kashani's attorney selection and litigation funding decisions and any communications made in connection with those decisions constitute statements or writings "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(2). See *Tuszynska*, *supra*, 199 Cal.App.4th at p. 268; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Samson's and Kashani's attorney selection, litigation funding decisions, and the communications made in connection with those decisions were not mere evidence related to liability. Rather, they constituted speech or petitioning activity that formed the basis for liability. While Dorsey's identity as

12

attorneys was not an *element* of NAMA's claims, their activities in allegedly conspiring with Samson and Kashani and/or sanctioning Samson's and Kashani's improper conduct in funding the litigation against NAMA form the crucial basis of the present lawsuit.

### B.     *Likelihood of Prevailing on the Merits*

In determining whether a claim "lacks even minimal merit" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89), "the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim.  (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 411-412.)  [¶]  In deciding this question the court again considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); however, it may not weigh the credibility or comparative probative strength of competing evidence.  (*Wilson* [*v. Parker*, *Covert & Chidester* (2002)] 28 Cal.4th [811,] 821.)  Rather, the court considers whether the plaintiff has made a prima facie showing of facts based on competent admissible evidence that would, if proved, support a judgment in the plaintiff's favor.  (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 646, disapproved on other grounds in *Equilon* [*Enterprises v. Consumer Cause*, *Inc.* (2002)] 29 Cal.4th [53,] 58-59.)" (*Mann*, *supra*, 120 Cal.App.4th at p. 105.)

NAMA contends that Dorsey is liable for accepting fraudulent transfers of funds from Alliance Network and for conversion of those funds.  It argues the transfers of funds were fraudulent because the transferor (Alliance Network) was or was about to become insolvent and did not receive reasonably equivalent value for the transfer and because the transfers were made with the intent to evade a creditor, namely NAMA.

### 1.     Fraudulent Conveyance Under UFTA

The Uniform Fraudulent Transfer Act (UFTA) specifies a transfer is fraudulent if, among other things, it is made (1) "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor" (Civ. Code, § 3439.04, subd. (a)(1)) (referred to as involving "actual fraud"), or (2) where the transferor is or will likely become insolvent and the

13

transfer is made "[w]ithout receiving a reasonably equivalent value in exchange" (Civ. Code, §§ 3439.04, subd. (a)(2) & 3439.05) (referred to as involving "constructive fraud").[3]  Under the UFTA a creditor may void a fraudulent transfer, attach an asset in the possession of a transferee, obtain an injunction against the transferee prohibiting further disposition of a fraudulently transferred asset, or obtain any other relief the circumstances require.  (Civ. Code, § 3439.07, subd. (a)(1)-(3).)

Even if a showing of actual intent to hinder, delay, or defraud a creditor is made, a statutory exception exists as follows:  "A transfer or an obligation is not voidable under [Civ. Code, § 3439.04, subd. (a)(1), the actual fraud provision] against a person who took in good faith and for a *reasonably equivalent value . . . .*"  (Civ. Code, § 3439.08, subd. (a), italics added.)  Likewise, as noted above, to establish constructive fraud a creditor must demonstrate that the transfer was made or the obligation was incurred without the transferor receiving "*reasonably equivalent value*" in exchange.  (Civ. Code, §§ 3439.04, subd. (a)(2) & 3439.05, italics added.)  Thus, where the transfer was made for a reasonably equivalent value, under either the actual or the constructive fraud test, a creditor such as NAMA cannot prevail.[4]

---

**3**      We note that a showing of actual intent to defraud on the part of the transferee, in this case Dorsey, is not required to establish a fraudulent transfer claim as authorized by Civil Code sections 3439.04, subdivision (a)(2) and 3439.05.  A plaintiff need not establish that a transferee engaged in any wrongdoing to state a claim for fraudulent transfer under these statutes.  (*Hansen v. Cramer* (1952) 39 Cal.2d 321, 325 ["the existence of any intent of fraud on the part of either the grantor or the grantee is an immaterial factor"].)  NAMA argues that because it need not show Dorsey engaged in wrongdoing to state a claim for fraudulent transfer, this cause of action was not one for civil conspiracy and thus section 1714.10 does not apply.  We agree, but as we explain, we conclude that the anti-SLAPP statute precludes maintenance of NAMA's complaint in its entirety.

**4**      Under the exception to the actual fraud test, Dorsey would have to prove its good faith.  (*Plotkin v. Pomona Valley Imports* (*In re Cohen*) (Bankr. 9th Cir. 1996) 199 B.R. 709, 719.)  A cause of action for actual fraud would fall under the protection of section 1714.10, however, because an attorney-client civil conspiracy would necessarily be involved.  Because we hold below that a debtor such as Alliance Network can prefer an attorney creditor (Dorsey) over a judgment creditor (NAMA) without violating the law,

14

NAMA contends its evidence established that Alliance Network did not receive reasonably equivalent value from Dorsey in exchange for the attorney fees it paid Dorsey. It reasons as follows. All of the payments made by Alliance Network were for attorney fees incurred by Samson, Kashani, and Prime in the arbitration, post-arbitration enforcement proceedings, the federal court action, and the New York litigation. The only consideration to Alliance Network in return for these payments was the fulfillment of its obligation under the operating agreement to pay Samson's and Kashani's attorney fees in litigation arising out of their role as managers of Alliance Network. To wit, section 4.01(g) of the operating agreement provided that Alliance Network "shall" defend and indemnify Samson and Kashani "against any and all claims, liability, damages, losses, costs and expenses (including, without limitation, attorneys' fees and costs) arising out of any and all acts of [Samson and Kashani] and officers taken in good faith in connection with [Alliance Network] or its business activities." NAMA argues that Alliance Network was not obligated to indemnify Samson's and Kashani's legal fees because the fees were incurred litigating over activities the latter did not take in good faith. They point to the following evidence as demonstrating Samson and Kashani did not act in good faith: (1) the arbitrators found Samson's and Kashani's refusal to distribute funds and their use of that money instead for a litigation reserve fund was self-dealing; (2) the district court found that Samson's and Kashani's attempt to thwart NAMA from arbitrating its claims against them was bad faith conduct that smacked of chicanery; (3) the Ninth Circuit's opinion adopted the district court's opinion; and (4) the arbitrators found Samson and Kashani guilty of discovery misconduct and imposed sanctions. NAMA concludes that Alliance Network therefore had no obligation to pay those attorney fees for Samson and Kashani and the funds it transferred to Dorsey were not exchanged for consideration of reasonably equivalent value. It had no contractual obligation under any circumstances to

Dorsey's good faith in the transaction follows as a matter of course. Therefore NAMA could not establish that Dorsey violated an independent duty it owed to NAMA (§ 1714.10, subd. (c)(1)), and could not surpass the obstacle presented by section 1714.10.

15

pay for Prime's attorney fees.  As to the legal fees Dorsey charged Samson and Kashani for representing them in the New York action, NAMA argues that it sued Samson and Kashani derivatively on behalf of Alliance Network and its affiliates, and thus Samson and Kashani were effectively Alliance Network's opposing parties.

The trial court concluded Alliance Network funds were transferred to Dorsey in exchange for legal services rendered to Samson and Kashani, such that Samson and Kashani, and by extension Alliance Network, received reasonably equivalent value for the payments.  NAMA contends this constituted error.  We disagree.

The UFTA does not define "reasonably equivalent value."  It provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied" (Civ. Code, § 3439.03), but that offers little or no guidance here.  The crux of NAMA's argument is that there was in fact no obligation on Alliance Network's part to pay Samson's and Kashani's legal fees, let alone Prime's.  While we agree that *ultimately* courts, including this one, concluded in effect that Samson and Kashani acted in bad faith in some respects, the legal fees paid to Dorsey were incurred in significant part in an effort, albeit an unsuccessful one, to defeat a finding of bad faith conduct.  This court's opinion affirming the trial court's order confirming the arbitration panel's award was filed in June 2012, long after the challenged transfers to Dorsey of legal fees from Alliance Network took place.  We cannot view the transfers retrospectively from the knowing vantage point of hindsight and conclude that Alliance Network should not have paid Samson's and Kashani's legal fees.  Although Alliance Network might now justly claim that it should be reimbursed for the legal fees it paid on behalf of Samson and Kashani where instances of the managers' conduct have been found to have been in bad faith, it does not follow that those transfers did not represent an exchange of reasonably equivalent value at the time they were made.  NAMA does not contend that Dorsey overcharged for its services or did not rightfully account for its efforts on behalf of Samson and Kashani.  It concedes for our present purposes that the fees were appropriate.

16

We agree with Dorsey that when it undertook the representation it should not have had to guess or engage in a lengthy analysis to determine whether Alliance Network did or did not have an indemnity obligation. All that was required was that Dorsey provide reasonable value to satisfy Alliance Network's *putative* indemnity obligation. Nor did Dorsey have a duty to withdraw from the litigation and return the fees previously paid by Alliance Network once the arbitration panel found that Samson and Kashani had acted inimically to the interests of Alliance Network and abdicated their duties as managers; Dorsey was entitled to continue to represent its clients in attempting to challenge first in the trial court and then on appeal the arbitration panel's conclusions. Were we to decide otherwise and find that Dorsey's acceptance of payment from Alliance Network for Samson's and Kashani's legal fees constituted Dorsey's collusion in receipt of *fraudulent* transfers, we would be creating a significant obstacle to attorneys' ability to represent clients in such matters, where a third party's indemnity obligation might *later* be found to have been defeated by a client's conduct. Attorneys must be free to put forth their best efforts in representing such a client and attempting to secure findings in the client's favor. It would place an undue burden on attorneys and clients to require attorneys to evaluate the likelihood of potential clients prevailing in a case-in-chief and the contractual indemnity theories before ever agreeing to represent a client *under threat of at some point being found to have engaged in a fraudulent transfer merely for accepting payment of their fees*. That cannot be what the Legislature contemplated when it provided in Civil Code section 3439.08, subdivision (a), that a transfer that would otherwise be voidable (such as where the debtor made the transfer with actual intent to defraud another creditor) is not voidable against one who took in good faith for a reasonably equivalent value. Rather, we conclude the definition of "reasonably equivalent value" is more straightforward: whether the value of the legal services provided by Dorsey was worth what it charged for those services. The answer here is yes. Viewed objectively, Dorsey's services were worth the amount it charged for those services, and thus reasonably equivalent value existed. NAMA does not contend otherwise. In this instance, Alliance Network could reasonably conclude at the outset of the case that it had an indemnity

17

obligation to pay Samson's and Kashani's legal fees unless and until findings were conclusively made that negated that obligation, and it therefore received reasonably equivalent value in exchange for what it paid for those services.

NAMA accurately points out that Alliance Network had no contractual obligation to pay the legal fees incurred by Prime, the member of Alliance Network wholly owned and controlled by Samson and Kashani, and therefore Alliance Network received no consideration in return for any money it paid on behalf of Prime toward its representation by Dorsey. The point, however, is that "reasonably equivalent value" refers to the objective value of the legal services, not to the subjective value of what the services were ultimately worth to Alliance Network. It stretches too thin both logic and fairness to chill Dorsey's ability to represent Prime, whose interests were in almost every respect aligned with those of Samson and Kashani (as NAMA strenuously argued in the trial court) by requiring it to finely parse the specifics of the contractual indemnity provision and refuse to represent Prime for fear of being found to have engaged in fraudulent transfers.[5] NAMA's remedy is to seek disgorgement of the fees paid on behalf of Prime from Samson and Kashani, not from Dorsey. We recognize of course that NAMA has attempted to collect its judgment but found Samson and Kashani to be judgment proof because it first paid Dorsey's fees. Be that as it may, Dorsey's actions were not blameworthy.

Dorsey's actions were not wrongful because "[a] debtor may pay one creditor in preference to another, or may give to one creditor security for the payment of his demand in preference to another." (Civ. Code, § 3432.) Case law has similarly held that a debtor may prefer one creditor over another. In *Wyzard v. Goller* (1994) 23 Cal.App.4th 1183, 1189, this court held that a preferential transfer, if made for proper consideration but with recognition that the transfer will effectively prevent another creditor from collecting on

---

[5]     NAMA has not demonstrated or suggested how it would be possible to segregate the legal fees paid on behalf of Prime versus those paid on behalf of Samson and Kashani. For that reason as well it has not demonstrated a likelihood of prevailing on the merits of its claim by having the ability to prove its damages.

its debt, is not one made with actual intent to hinder, delay, or defraud that creditor. More specifically, a client's payment of the client's money to his attorney for legal services provided to him, in preference to his other creditors, is not a fraudulent transfer. The trial court here relied heavily on *Wyzard*. We agree that the principles stated in *Wyzard* are applicable here.

NAMA accurately points out that some transfers occurred when Dorsey knew the arbitrators had condemned Samson's and Kashani's creation of a litigation reserve using money they should have distributed to NAMA and the other members of Alliance Network. Dorsey nonetheless continued to represent Samson's, Kashani's, and Prime's interests by challenging the arbitration panel's award first in the trial court and then on appeal, as well as in related actions in different forums. However, as we have discussed above, Dorsey was not obligated to discontinue its representation when an adverse finding was made. As a matter of policy, we conclude that it was entitled to continue representing its clients without being guilty of engaging in fraudulent transfers.


### 2. Conversion

NAMA also asserted a cause of action against Dorsey for conversion. The trial court rejected the claim because the money that was the object of the conversion claim was not in the form of a specific sum capable of identification. NAMA contends on appeal that the trial court was wrong. We agree with the trial court.

Conversion requires an "act of dominion wrongfully exerted over the personal property of another." (*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 485.) It also requires plaintiff's showing of ownership or a right to possession of the property and defendant's wrongful act inconsistent with such property rights. (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1065.) Money cannot be the subject of a conversion claim unless a specific sum capable of identification is involved. (*Software Design*, *supra*, 49 Cal.App.4th at p. 485.)

Dorsey contends that while the arbitrators found that Alliance Network should not have retained funds as a litigation reserve on Dorsey's clients' behalf and instead should

19

have distributed the funds to the members of Alliance Network, the arbitrators did not hold that NAMA had any direct property interest in the funds so retained. The roughly $13 million awarded to NAMA was merely a damages award.

The arbitration panel ordered as follows: "Claimant Alliance Network shall pay to NAMA . . . $12,750,405.00 (*representing NAMA's 70% share of the $18,214,865.95 of proceeds distributed to Alliance Network in June*, *2006*) . . . ." (Italics added.) Alliance Network filed a petition to correct or vacate the award, arguing that NAMA had asserted no claim that gave rise to a damage award, instead seeking only a monetary distribution of its share of the reserve fund, not monetary damages. (B226167, at p. 12.) The trial court rejected that assertion, denying the petition to correct or vacate the arbitration award and granting NAMA's petition to confirm it. (B226167, at p. 14.) The nature of the arbitration panel's award, whether it was an award of damages or an order for a monetary distribution of NAMA's portion of the reserve fund, was a primary topic of discussion in the ensuing appeal. We observed that "[t]he [arbitration] panel was entirely clear in its interpretation of the award that it was awarding monetary damages against Alliance Network." (B226167, at p. 17.) We upheld the trial court's order confirming the arbitration award, noting that "[t]he provision in the final award of 'damages to be paid to NAMA in the amount of $12,750,405 was intended by the Tribunal as an appropriate award of monetary relief to NAMA . . . , and to constitute one component of the total package of relief awarded in the Final Award in resolution of all of the parties' various claims and defenses. Of these, the Panel regarded the "failure to distribute" the $18,214,865.95 of proceeds paid to Alliance Network in June, 2006 and the inappropriate use of such funds for other purposes such as Phase 3 as the most significant, *although not the only*, basis for awarding monetary compensation to NAMA. The Tribunal *did not*, *and did not purport to*, undertake the task of calculating what amount of distributive share NAMA would have received had Alliance timely distributed those reserves in accordance with the contractually-specified "waterfall" at the time those funds were received instead of using them for other, inappropriate, purposes.'" We continued, "'the Tribunal regarded application of NAMA's ownership interest against the reserve amount

20

as an appropriate *benchmark* for selecting the specific amount of monetary relief to be awarded to NAMA . . . . [T]he Final Award was not intended to limit the basis for the monetary award only to Alliance Network's failure to distribute the $18,214,865.95, nor to limit the Final Award's determination of the appropriate monetary award to NAMA to a lesser net amount derived by . . . application of the various distribution-related provisions contained in the parties' agreement . . . .'" (B226167, at pp. 21-22.) We upheld the amount of the monetary relief awarded to NAMA as appropriate, despite the fact the amount was not ""'"susceptible to precise determination"'"" and instead "used the amount available for distribution and the parties' percentage interests as a 'benchmark,' or starting point, on which to base its calculation of damages." (B226167, at p. 23.)

In light of these observations in our previous opinion, NAMA cannot successfully contend that there was a specific sum capable of identification as being "owned" by NAMA on which to base a cause of action for conversion. The arbitrators did not declare NAMA owned funds held by Alliance Network in the amount of its distributive share. The panel awarded monetary damages, using NAMA's percentage interest as a starting point in setting the amount of damages. NAMA was a judgment creditor of Alliance Network, not a holder of title or of a right to possession of Alliance Network's funds.

Likewise, the fact that the New York court granted a temporary restraining order (TRO) barring Alliance Network from authorizing Dorsey to take money from the client trust account held by Dorsey does not establish the existence of a specific sum of money constituting the property of NAMA. Even if NAMA's assertions are true that Dorsey withdrew fees from the Alliance Network client trust account while the TRO was in effect, the means of redressing that wrong is not an action for conversion in California state court.

21

Thus, NAMA has not demonstrated a likelihood of prevailing on the merits of its conversion claim. This cause of action was also properly disposed of by way of Dorsey's anti-SLAPP motion.[6]

That being the case, and because the court's order granting the special motion to strike under section 425.16 is entirely dispositive of the matter, it is not necessary for us to discuss the trial court's reliance on section 1714.10 in dismissing NAMA's complaint.

## III. Sanctions Award

The trial court sanctioned NAMA's counsel $5,000, payable to the court. NAMA contends that the court abused its discretion in awarding sanctions because its assertions of fact and law did not meet the high standard of frivolousness required to justify imposition of sanctions. We agree.

The standard for imposing sanctions has been described as whether any reasonable attorney indisputably would agree the claims are totally and completely without merit. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649.) "Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . ." (*Id.* at p. 650.) Sanctions should be used most sparingly to deter only the most egregious conduct. (*Id.* at pp. 650-651.)

NAMA's fraudulent transfer and conversion claims were not totally and completely without merit. While we conclude as to the fraudulent transfer claim that "reasonably equivalent value" was exchanged, NAMA made a colorable argument that it was not. That term has not been well defined and NAMA was permitted to make the legal assertions it did. Likewise with the conversion claim, while we conclude there was not a specific, definable sum capable of identification, NAMA's argument was not outlandish. The arbitration panel specified that the particular funds Samson and Kashani withheld should have been distributed; it was only the fact that the award was for

---

[6] NAMA has abandoned on appeal any argument in support of its ability to maintain its remaining causes of action for intentional interference with contract and unjust enrichment.

22

monetary damages rather than distribution qua distribution that the conversion argument could not succeed.

NAMA has not pressed on appeal its claim for intentional interference with contract, and we have not considered it here. On its face, however, we again find that while the argument was unlikely to succeed, NAMA could argue that the arbitration award was akin to a judgment with which Samson and Kashani, and by extension Dorsey, could interfere. Samson and Kashani were not parties to the arbitration, having been dismissed as individuals early on, and thus were arguably liable for interfering with implementation of the award. It cannot be said that no reasonable attorney would agree the claim was totally and completely without merit. Similarly, NAMA's assertion of a claim of unjust enrichment was not an example of egregious conduct. It had some arguable basis upon which to contend that Dorsey was not entitled to obtain the Alliance Network funds.

Dorsey contends the sanctions were premised mainly on a finding that NAMA misrepresented the nature of the arbitration award. The trial court indicated that in its view NAMA had misrepresented prior findings and had "premise[d] its complaint on the assertion that the Operating Agreement, Arbitration Award and a temporary restraining order each prohibit Samson and Kashani from paying their own legal fees with Alliance funds." It said NAMA's assertions were "at best, a strained interpretation of the relevant orders and at worst an effort to mislead the court." The arbitration award did not prohibit Samson and Kashani from paying past or future attorney fees and did not order Dorsey to refuse any payments from Samson and Kashani unless and until NAMA's judgment was satisfied.

The trial court pointed out that the arbitrators had refused NAMA's request to order disgorgement of attorney fees. NAMA had also previously made a turnover application relating to funds held by Alliance Network's counsel, Greenberg Traurig, which Commissioner St. George had recently denied. The trial court here admonished NAMA's counsel that "the arbitration award did not say what he was representing and that in any case, the *Wyzard* case precluded [NAMA's] claim."

23

It is true that the arbitration award, confirmation of which this court previously upheld and with which we are therefore well acquainted, did not prohibit Samson and Kashani from paying past or future attorney fees and did not order Dorsey to refuse any payments from Samson and Kashani unless and until NAMA's judgment was satisfied. It did, however, strongly condemn Samson and Kashani for withholding from the members of Alliance Network distribution of over $18 million on the theory that Samson and Kashani could retain those funds to pay their own attorneys in anticipated litigation against one of the members, and awarded as monetary damages to NAMA its percentage interest in that distribution fund. (B226167, at pp. 9-10.) The arbitration award also specified that Alliance Network could not satisfy the monetary judgment by any means that would require NAMA to pay, directly or indirectly, any portion of the obligation. (B226167, at p. 11.) It was at least a colorable argument for NAMA to contend that an identifiable fund was involved, and that it was wrongful for Samson and Kashani to pay their attorney fees before and to the exclusion of paying the damage award.

As to NAMA's contention that Dorsey violated the New York court's TRO by withdrawing funds from the Alliance Network client trust account after the date the TRO was entered, the trial court concluded the TRO enjoined only prospective distributions by Alliance Network of funds received from WMCV, Related, or its affiliates, not funds Dorsey received from Alliance Network out of the $18 million that was not distributed as it should have been in June 2005. NAMA argued that the funds in the trust account remained the property of Alliance Network, and thus any withdrawals from the trust account after the effective date of the TRO did in fact violate the TRO. We did not find it necessary to reach the merits of this issue, and merely note for purposes of the sanctions award that NAMA's position was at least debatable.

Just as Dorsey was permitted to zealously represent the interests of its clients and continue to do so even after those individuals were found to have engaged in self-dealing and violations of NAMA's contractual rights without fear of being found to have engaged in fraudulent transfers or other wrongful conduct by receiving payment for their legal services, so too was NAMA's counsel entitled to ardently present factual assertions and

24

legal arguments that pushed the edge of the envelope without fear of incurring monetary sanctions. The litigation arising out of the real estate development at issue here has been lengthy and highly contentious, and understandably frustrating for NAMA, which recovered only a fraction of the considerable damages it was awarded based on the arbitrators' finding that Samson and Kashani unquestionably and flagrantly breached their fiduciary duties to NAMA. Part of the breach of fiduciary duty was their decision to reserve money they should have distributed to members of Alliance Network to use instead to fund litigation against NAMA, the owner of the largest percentage interest. Counsel for NAMA has attempted to employ creative methods to secure NAMA's recovery, but in our view has not stepped beyond the bounds of reason by making assertions that are totally and completely without merit. We therefore conclude that the $5,000 sanction award must be reversed.

## DISPOSITION

The order granting Dorsey's anti-SLAPP motion to strike the proposed complaint filed by NAMA is affirmed. The order granting Dorsey's motion for sanctions pursuant to Code of Civil Procedure section 128.7 is reversed. Costs on appeal are awarded to Dorsey.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.                    WILLHITE, J.

25